# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARRIVA MEDICAL LLC, )<br>           )<br>     Plaintiff, )<br>           )<br>v.                       )<br>           )<br>UNITED STATES DEPARTMENT OF )<br>HEALTH AND HUMAN SERVICES, *et al.*, )<br>           )<br>           )<br>     Defendants. ) | Case: 1:16-cv-02521-JEB |

_____

## DEFENDANTS' RESPONSE TO PLAINTIFF'S CORRECTED SUPPLEMENTAL MEMORANDUM

Defendants, the United States Department of Health and Human Services ("HHS"), Thomas E. Price, in his official capacity as the Secretary of the United States Department of Health and Human Services ("Secretary of HHS" or "Secretary"),[1] and Patrick Conway, in his official capacity as the Acting Administrator of the Centers for Medicare & Medicaid Services ("CMS") (collectively "Defendants"), respectfully submit this response to Plaintiff's Corrected Supplemental Memorandum (ECF No. 27, 26). Although Plaintiff attempts to recite and force upon the Court the relief Plaintiff might like, the conclusion remains that Plaintiff is due no relief.

Plaintiff indulges in a recitation of Plaintiff's own version of the range of measures that CMS, the HHS Inspector General, and the U.S. Department of Justice might have employed to address Plaintiff's improper conduct, in lieu of a revocation of Medicare billing privileges. See ECF 27-1 at pp.6-7. It is not the role of a plaintiff to select, or to commend to a court's

---

[1]    Thomas E. Price has been confirmed as the Secretary of HHS. Pursuant to Fed.R.Civ.P. 25(d), Secretary Price is automatically substituted as defendant for the former Acting Secretary.

consideration, the particular exercise of valid regulatory authority that the plaintiff or the court might prefer an administrative agency to employ.[2]   In a matter such as this one that arises under the Social Security Act, we are led straight back to the precise and limited role that Congress conferred upon the courts in Medicare matters:  review of the final agency decision.   At most, if Plaintiff timely brought a final decision of the Secretary before a court for review, the court's proper role would be to assure itself that the agency had substantial evidence in support of its final decision and that the agency's decision comported with the applicable law.   42 U.S.C. § 405(g); see, e.g., Butler v. Barnhart, 353 F.3d 992, 999 (D.C. Cir. 2004); Beverly Health & Rehab. Servs., Inc. v. Thompson, 223 F. Supp. 2d 73 n.10 (D.D.C. 2002).   The court's role would be no more and no less than that.

Plaintiff specifies, at length, the maximal relief that it would like to receive from the revocation at this time.   See ECF 27-1 at pp.2-6.   This is little more than Plaintiff's attempt to extend its billing privileges for as long as possible.   Nearly three months after the issuance of CMS's revocation notice, after an unfavorable decision at the first-level of appeal, and after the CMS leadership (in its discretion), granted Plaintiff's request for a meeting to hear Plaintiff's arguments, Plaintiff filed its Complaint in this Court as a new effort to get its Medicare billing privileges restored, claiming that CMS's exercise of lawful authority was going to cause "irreparable harm."   The Supreme Court advised many years ago that a business should expect to be held to "the most demanding standards" in its quest for Medicare payments.   Heckler v. Cmty. Health Servs. of Crawford County, 457 US 51, 63 (1984).   It is hardly the most demanding of requirements to expect that a company will not submit scores of claims for dead people.   Plaintiff's

---

[2]   The possibility that Plaintiff's Medicare billing conduct may subject Plaintiff to additional penalties or actions is a matter outside this lawsuit.

billing conduct has caught up with Plaintiff.  CMS's data review has revealed that Plaintiff has submitted scores of Medicare bills for dead Medicare beneficiaries, and CMS has invoked the revocation authority that has been in place for years to redress this precise problem.

Plaintiff states glibly that Defendants' only interest surrounding Plaintiff's request to enjoin the revocation is 'programmatic' and 'bureaucratic,' see ECF 27-1 at p.3, as though the consistent administration of "a massive, complex . . . program . . . embodied in hundreds of pages of statutes and thousands of pages of . . .  regulations," Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 13 (2000), with a carefully-designed and exclusive remedial scheme for the resolution of challenges and disputes, were a matter of minimal public consequence.  Plaintiff reiterates that its dead-beneficiary claims were just a small fraction of Plaintiff's total billings.  That is a legal argument of Plaintiff's creation, cf. 42 C.F.R. § 424.535(a)(8)(i) (criterion for revocation), which has been previously rejected by the applicable authority, the HHS Departmental Appeals Board. [3]

Plaintiff is asking for "extraordinary" relief, see Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982), when it comes to court nearly three months after the issuance of the revocation notice,[4] asking this Court to rewrite the terms of Medicare law, on the grounds that Plaintiff has somehow been denied due process – despite having already had the opportunity to argue its position and to submit documentary evidence in support of its position before the reconsideration officer at the first level of appeal; despite the meeting that the CMS leadership freely granted

[3]    At the hearing on February 8, 2017, Defendants provided the Court with a copy of the recent ruling by the Appellate Division of the HHS Departmental Appeals Board in Med-Care Diabetic & Med. Supplies, Inc., Decision No. 2764 (Jan. 17, 2017).  The decision is also available at *www.hhs.gov/about/agencies/dab/index.html,* under "DAB Decisions" ("Board Decisions").  See also ECF No. 18 at n.5 (Defendants' summary of applicable law on revocation due to billing for dead Medicare beneficiaries)

[4]    CMS issued the notice of revocation on October 5, 2016.  The revocation took effect on November 4, 2016.  Plaintiff filed its Complaint on December 28, 2016.

Plaintiff's representatives in November; and despite Plaintiff's pending appeal before an ALJ. The suggestion that Plaintiff has been denied due process is meritless.

Plaintiff states that under the analysis in Mathews v. Eldridge, 424 U.S. 319 (1976), "the task for the Court is," in part, "to assess the 'probable value' or 'additional or substitute procedural safeguards,' [and] the 'risk of erroneous deprivation'…" See (ECF No. 27-1 at p.3). Those criteria were not set out in Eldridge for purposes of entering an injunction. They were criteria for assessing whether the process being afforded Eldridge was constitutionally adequate. Indeed, although the disability inquiry in Eldridge turned on the relatively complex question of whether or not Eldridge's medical condition had improved to the point that he no longer met the legal criteria to receive Social Security disability benefits, the Court found that the inquiry could be achieved largely by review of "routine" written reports, and hence, that the value of an evidentiary hearing "or even oral presentation" was relatively limited. See 424 U.S.at 344. One may reasonably assume that Plaintiff's case, which turns upon the blunt fact of scores of dead beneficiaries, entails even less nuance or complexity than the medico-legal Social Security disability inquiry. The risk that an erroneous deprivation of due process has occurred here is minimal, if at all.

Because this inquiry purports to turn on a very limited exception to Social Security Act jurisdictional law (and hence, Medicare jurisdictional law) from 40 years ago in Eldridge, one cannot lose sight of that analysis and ruling. One cannot forget the means by which terminated disability beneficiary Eldridge even got past the threshold in the first place: "Eldridge . . . raised at least a colorable claim that because of his *physical condition and dependency upon . . . disability benefits*, an erroneous termination would damage him in a way not recompensable through retroactive payments." 424 U.S. at 331 (all emphasis added). Even so, getting through that threshold was all that Eldridge achieved, ultimately. The Supreme Court's subsequent

recognitions -- of, *inter alia*,  the fact that disability benefits are not based on financial need or hardship; that the risk of an erroneous termination of the benefits was limited; that full payment of back benefits would be available if Eldridge did in fact prevail in his administrative appeal; and that "substantial weight" had to be accorded to the judgment of those whom Congress has entrusted with the administration of a program of this magnitude and character,  see id. at 349 -- led the Supreme Court to the conclusion that Eldridge was indeed receiving due process, and that he had no constitutional right to the hearing he would have preferred to get on a pre-termination basis.

In the Medicare arena, appellate authority recognizes that the interest of a *business* that complains because it has lost its right to seek Medicare dollars is "not particularly strong" to begin with.  See Cathedral Rock of N. Coll. Hill, Inc. v. Shalala, 223 F.3d 354, 364-65 (6th Cir. 2000) (citing Northlake Cmty. Hosp. v. United States, 654 F.2d 1234, 1242 (7th Cir. 1981)).  Arriva's plea fails to rise to the level of Eldridge's "at least . . .  colorable claim that because of his physical condition and dependency upon . . . [the] benefits, an erroneous termination would damage him in a way not recompensable through retroactive payments."  See Eldridge, 424 U.S. at 331.  But even if one does find Arriva to have made an "at least colorable claim," there can be no question that long-established Medicare law adequately affords due process and that there is no constitutional requirement of more.  *Eldridge himself* was due no more.  The appeals process for a revocation by CMS mirrors to a large extent the appeals process for other administrative actions involving a business's loss of participation in Medicare, i.e., a provider termination by CMS and the appeals process for an exclusion from federal healthcare programs by the HHS Inspector General.  These processes have been in place for years.  In its particulars, the revocation imposed by CMS on Plaintiff gave Plaintiff the right to a 30-day period, before the revocation even took effect, during which a first-level appeal could be initiated. During this period, Plaintiff had the opportunity to

submit a statement of position with evidence in support of that position, 42 C.F.R. § 405.803(c), to be adjudicated by a CMS officer who had no involvement in the initial decision, 42 C.F.R. § 405.803(b); Plaintiff also had the subsequent right to appeal before an ALJ, with further review available thereafter; and, in the event of a successful appeal at any point, full retroactive billing rights, 42 C.F.R. §§ 424.545(a)(2), 405.815.  This is due process, by any reasonable assessment.

Plaintiff has no substantial likelihood in prevailing on its contention that it has been deprived of a constitutional right of due process and this Court has no arguable jurisdiction at this time beyond that single question.  The Medicare jurisdictional bar, see 42 U.S.C. § 405(h) (incorporated by §1395ii), Ill. Council on Long Term Care, 529 U.S. at 13 ("virtually all legal challenges" must be channeled through the administrative agency), Heckler v. Ringer, 466 U.S. 602, 615 (1984) (no jurisdiction to enter injunctive relief), is straightforward and clear. Accordingly, Plaintiff's motion for injunctive relief should be denied, and the Complaint should be dismissed.

Dated:  February 21, 2017

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney
D.C. Bar #415793

DANIEL VAN HORN
Chief, Civil Division
D.C. Bar #924092

By:    */s/ Jason T. Cohen*
JASON T. COHEN
ME Bar #004465
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2523
Fax: (202) 252-2599
Email: jason.cohen@usdoj.gov