**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ARRIVA MEDICAL LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 16-2521 (JEB)** |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,** | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

As first-year law students learn, where a medical provider informs others that the infirm are dead when they are actually alive, it can lead to tort liability for emotional distress. This case reveals that the opposite type of mix-up can have consequences as well. Here, Plaintiff Arriva Medical LLC had a contract with the federal Medicare program to provide diabetic-testing supplies to individuals nationwide. In October 2016, however, Defendant Department of Health and Human Service's Centers for Medicare and Medicaid Services (CMS) informed Arriva that over a 5-year period the company had billed for 211 beneficiaries who were in fact already deceased. CMS then revoked the company's billing privileges and notified it that its Medicare-supplier contract would hence be terminated. Plaintiff responded by filing this suit against HHS and certain officials, asserting that it was entitled to a hearing before those debarments went into effect.

Arriva now moves for a preliminary injunction, claiming that the company may not survive absent prompt action from the Court. The Government opposes such relief, arguing that the company has neither exhausted Medicare's various administrative appeals nor demonstrated

a likelihood of success on the merits or irreparable harm.  As the Court agrees with the last two

points, it will deny Plaintiff's Motion.

## I.      Background

Established by the Medicare Act, 42 U.S.C. § 1395 *et seq.*, federal Medicare funds a

broad array of healthcare for elderly or disabled persons.  Functionally, it does so by reimbursing

companies that provide services or supplies to those individuals.  See Ne. Hosp. Corp. v.

Sebelius, 657 F.3d 1, 2 (D.C. Cir. 2011).  The Centers for Medicare and Medicaid Services, a

component of HHS, administers the program.  See Ark. Dep't of Health & Human Servs. v.

Ahlborn, 547 U.S. 268, 275 (2006).

In the Medicare landscape, Arriva primarily serves as a supplier of diabetic-testing

equipment, notably strips that patients insert into a glucometer to determine blood-glucose levels.

See ECF No. 12 (Complaint), ¶¶ 36-38.  For the past seven years, its particular corner has been

the mail-order market, where it has captured roughly half of the total diabetes-equipment

consumer base and serves as the only supplier of two prevalent models of blood-glucose testing

meters and their associated strips.  See Pl. Mot., Exh. A (Declaration of Claudio Araujo), ¶ 26.

Because of Plaintiff's niche, many of its customers tend to hail from rural areas where access to

healthcare is relatively limited.  See Compl., ¶ 39.  To translate for the numerically inclined,

Arriva serves approximately 500,000 Medicare beneficiaries, roughly 160,000 of whom reside in

rural zip codes.  See Araujo Decl., Exh. 7 (2016 Zip Code Mix).  The company, in turn, depends

on Medicare reimbursements for over 90% of its business.  See Araujo Decl., ¶ 20.

Arriva did not stumble into the Medicare market.  In the heavily regulated Medicare

system, would-be suppliers must first apply with CMS to obtain billing privileges so that they

can charge Medicare for sending supplies.  See 42 C.F.R. § 424.57(b), (c).  CMS then runs a

competitive-bidding program where suppliers bid for the right to sell equipment to beneficiaries.

See, e.g., Araujo Decl., Exh. 5 (2014 National Mail-Order Recompete).  For those companies

that win, CMS contracts with them so that beneficiaries must order equipment from those

suppliers.  See Compl., ¶ 26.  A condition of these contracts is that companies, like Arriva, must

also maintain their Medicare billing privileges.  See Araujo Decl., Exh. 1 (2013 National Mail-

Order Contract) at 6; id., Exh. 2 (2016 National Mail-Order Contract) at 1-2.

That takes us to this case.  On October 5, 2016, CMS's Provider Enrollment &

Oversight Group (PEOG) wrote to Arriva that CMS would be revoking the company's billing

privileges in thirty days (November 4, 2016) and barring it from reenrolling for a period of three

years.  See Araujo Decl., Exh. 10 (October 5, 2016, Revocation Letter from PEOG to Arriva) at

1.  The Group specified that Plaintiff was not in compliance with a particular federal regulation:

> (a) Reasons for revocation.  CMS may revoke a currently enrolled
> provider or supplier's Medicare billing privileges and any
> corresponding provider agreement or supplier agreement for the
> following reasons:
>
> . . .
>
> (8) Abuse of billing privileges.  Abuse of billing privileges
> includes either of the following:
>
> (i) The provider or supplier submits a claim or claims for
> services that could not have been furnished to a specific
> individual on the date of service.  These instances
> include but are not limited to the following situations:
>
> (A) Where the beneficiary is deceased.

42 C.F.R. § 424.535.  A data review of claims submitted between April 2011 and April 2016

revealed that the company had billed Medicare for items provided to 211 beneficiaries who,

according to the Social Security Administration's rolls, were already deceased.  See Revocation

Letter at 1.  As evidence, PEOG attached a 47-person sample of the claims data.  Id.; see Compl.,

¶ 45.  Plaintiff, for its part, was at least generally aware that these checks were taking place,

especially since it had in the past refunded Medicare for faulty billing.  See Compl., ¶ 52; see also ECF No. 23 (Transcript of PI Hearing) at 14:14-17 ("I'm sure that there is a sense that there are audits that happen, but we were not aware that there had been any concern raised about the alleged billing of deceased beneficiaries.").

The letter then informed Arriva that it could "request a reconsideration before a hearing officer," which would be "an independent review . . . conducted by a person not involved in the initial determination."  Revocation Letter at 2.  The reconsideration request would need to state Arriva's basis for disagreeing with the revocation and attach any additional evidence that the company chose to provide for the purposes of Medicare's administrative proceedings.  Id.

On October 28, 2016, Plaintiff asked PEOG to reconsider, submitting explanations and medical documentation for the sample-data individuals — e.g., that the 211 billing errors constituted only roughly .1% of the total number of beneficiaries who died in that period.  See Compl., Exh. 1 (November 2, 2016, Reconsideration Letter from PEOG to Arriva) at 2-3.

Five days later, on November 2, the Group wrote back that it would affirm its original decision.  Id.  PEOG first summarized Arriva's arguments.  Id. at 3; see Araujo Decl., Exh. 8 (2012-2016 Deceased Beneficiaries Chart) (listing over 130,000 deceased beneficiaries over five years).  The decision then reasoned that: on 9 occasions, Arriva realized that a beneficiary was deceased but processed the order anyway; for 13 claims, it made no contact with the beneficiary within 14 days of the shipping date (as Medicare guidance requires); and for an unspecified number of claims, PEOG did not find credible the company's allegations that beneficiaries' caregivers placed orders inadvertently.  See Reconsideration Letter at 3; see also Medicare Program Integrity Manual (MPIM), § 4.26.1 ("Contact with the beneficiary or designee regarding refills shall take place no sooner than 14 calendar days prior to the delivery/shipping

date.") (chapters available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/internet-only-manuals-ioms-items/cms019033.html).  PEOG last found it irrelevant that CMS did not reimburse Arriva for these mistaken claims or that the company had already refunded Medicare, as those facts did not bear on whether or not Plaintiff had billed for deceased beneficiaries.  See Reconsideration Letter at 3-4.

If Arriva objected, PEOG wrote, its recourse was to seek a hearing before an HHS administrative-law judge and then, if necessary, with the agency's Departmental Appeals Board (DAB).  Id. at 4-5; see 42 C.F.R. §§ 498.40-.95.  Should it ultimately prevail, Medicare regulations would retroactively reimburse it for any "unpaid claims for services furnished during the overturned period."  Id. § 424.545(a)(2).

After that adverse decision, the revocation went into effect as scheduled, and CMS informed affected beneficiaries that "Medicare won't pay [Arriva] for diabetes testing supplies that [it] delivers to your home."  Araujo Decl., Exh. 11 (November 7, 2016, Letter from CMS). In other words, customers would need to switch mail-order suppliers or visit their "local pharmacy or storefront supplier" if Arriva left the program.  Id. (informing customers how to switch).

Distressed by these actions, Plaintiff arranged a meeting with several CMS officials at HHS's D.C. headquarters on November 23, 2016.  See Araujo Decl., ¶ 18.  That get-together included: CMS's Principal Deputy Administrator and Chief Medical Officer; the Directors of PEOG, the Center for Program Integrity, the Investigations and Audits Group, the Chronic Care Policy Group; and several Deputy Directors as well as a representative from the Division of Compliance and Appeals.  Id.  Arriva then "walked through a prepared slide presentation"

regarding its case, after which the Director of the Center for Program Integrity "committed to reviewing Arriva's concerns and getting back to Arriva leadership within 10 days." Id.

Ten days passed without a word, and on December 6, 2016, a separate CMS contractor wrote Arriva that the agency was also terminating (effective January 20, 2017) the company's National Mail-Order Contract. See Araujo Decl., Exh. 13 (December 6, 2016, Termination Letter from Palmetto GBA to Arriva). Because Plaintiff no longer maintained billing privileges — given the prior PEOG actions — it had breached various provisions of its Medicare contract by not having an active billing number. Id. at 1-2. The contractor noted that to challenge this contract termination Arriva could either submit a corrective-action plan or request a hearing before an independent hearing officer. Id. at 2 (citing 42 C.F.R. § 414.423(c), (f)).

By December 20, 2016, Arriva received a follow-up from the in-person meeting with CMS officials: The agency told Plaintiff by email that it would not modify its decision. See Compl., ¶ 65; Pl. Mot. at 13. A week later, on December 27, Arriva sought ALJ review of the PEOG decision. See Compl., ¶ 65. A day after that, on December 28, Plaintiff filed the instant suit along with an Application for a Temporary Restraining Order, see ECF No. 4, claiming that both the Due Process Clause and Administrative Procedure Act guaranteed it a hearing before CMS revoked billing privileges or terminated contracts. Id., ¶¶ 84-95. Two days later, Defendant told Arriva that, "upon the particular facts and circumstances here, CMS is willing to defer the effectuation of the contract termination until such date as the [DAB] renders the final agency decision on Plaintiff's revocation." Def. Mot. at 10.

At the subsequent TRO hearing on January 4, 2017, the Court denied Plaintiff's Application, but allowed it to more fully brief the issues in a preliminary-injunction motion. See

ECF No. 24 (Transcript of TRO Hearing) at 43:20-44:11.  Now ripe are the Government's

Motion to Dismiss on jurisdictional grounds and Arriva's Motion for a Preliminary Injunction.

## II.     Legal Standard

### A.  Rule 12(b)(1)

When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must establish

that the Court indeed has subject-matter jurisdiction to hear its claims.  See Lujan v. Defenders of

Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. Dep't of Interior, 231 F.3d 20, 24 (D.C.

Cir. 2000).  "Because subject-matter jurisdiction focuses on the court's power to hear the

plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure

that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order

of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  In policing its jurisdictional borders,

the Court must scrutinize the complaint, treating its factual allegations as true and granting the

plaintiff the benefit of all reasonable inferences that can be drawn from those facts.  See Jerome

Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The Court need not rely

"on the complaint standing alone," however, but may also look to undisputed facts in the record

or resolve disputed ones.  See Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

### B.  Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter

v. NRDC, 555 U.S. 7, 24 (2008).  A party seeking preliminary relief must make a "clear showing

that four factors, taken together, warrant relief: likely success on the merits, likely irreparable

harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with

the public interest."  League of Women Voters of United States v. Newby, 838 F.3d 1, 6 (D.C.

Cir. 2016) (quoting Pursuing America's Greatness v. FEC, 831 F.3d 500, 505 (D.C. Cir. 2016)).

Before the Supreme Court's decision in Winter, 555 U.S. 7, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another factor.  Davis v. PGBC, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009); see Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  This Circuit has hinted, though not held, that Winter — which overturned the Ninth Circuit's "possibility of irreparable harm" standard — establishes that "likelihood of irreparable harm" and "likelihood of success" are "'independent, free-standing requirement[s].'"  Sherley v. Sebelius, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (quoting Davis, 571 F.3d at 1296 (Kavanaugh, J., concurring)).  Unresolved, too, is the related question of "whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits."  Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014); see Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977).  Courts have also observed possible "tension in the case law regarding the showing required on the merits."  Pursuing America's Greatness, 831 F.3d at 505 n.1 (comparing Winter's "likely" success with the D.C. Circuit's "substantial likelihood" standard); see, e.g., Sherley, 644 F.3d at 398 (using "more likely than not to succeed"); Davis, 571 F.3d at 1295 (suggesting "high likelihood of success"); Del. & Hudson Ry. v. United Transp. Union, 450 F.2d 603, 619 (D.C. Cir. 1971) (equating "substantial likelihood" with "reasonable probability"); Wheelabrator Corp. v. Chafee, 455 F.2d 1306, 1317 (D.C. Cir. 1971) (requiring "considered judgment of a probability of success").

Regardless of the extent to which showings of irreparable harm and success on the merits can be diminished, some fundamentals of the four-factor test bear reiterating.  Because "the basis of injunctive relief has always been irreparable harm," Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006), a plaintiff must, at minimum, "demonstrate that

irreparable injury is <u>likely</u> in the absence of an injunction," not just that injury is a "possibility." <u>Winter</u>, 555 U.S. at 21; <u>see</u> <u>Davis</u>, 571 F.3d at 1292.  Before and after <u>Winter</u>, similarly, this Circuit has maintained its standard that a plaintiff may obtain relief after demonstrating a "substantial likelihood" of success.  <u>Pursuing America's Greatness</u>, 831 F.3d at 505.  Where the plaintiff can show <u>neither</u> harm nor success, it is plain that no relief is warranted.  <u>See</u> <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u>, No. 16-1534, 2016 WL 4734356, at *17 (D.D.C. Sept. 9, 2016); <u>see also</u> <u>Ark. Dairy Co-op Ass'n, Inc. v. USDA</u>, 573 F.3d 815, 832 (D.C. Cir. 2009) (denying injunction when plaintiff shows "no likelihood of success").

## III.   Analysis

The focal dispute is whether Arriva should be able to bypass Medicare's appeals pipeline, both to bring suit without exhausting that process and then to preemptively halt the revocation of its billing privileges so that it can obtain additional pre-deprivation process first.  These two issues — one involving jurisdiction and the other injunctive relief — are at the heart of the competing Motions here.  More specifically, Defendant argues that Plaintiff must first exhaust Medicare's serpentine appeals process before entering federal court, while Arriva invokes an exception to that jurisdictional bar and next contends that the Court should enjoin CMS from acting without certain additional pre-revocation procedural safeguards.  The Court walks through these dual issues separately.

### A.  <u>Jurisdiction</u>

The Government's opening salvo is that the Court may not yet even hear Arriva's claims, as the company has not finished its ALJ review, let alone the DAB appeal that follows.  While the regulatory scheme indeed restricts courts' jurisdiction, the Medicare Act is no complete barrier to the present claims.

Defendant's exhaustion theory is rooted in a set of statutory requirements.  See Empire

Health Found. v. Burwell, No. 15-2251, 2016 WL 5107010, at *4 (D.D.C. Sept. 19, 2016).  The

Act incorporates a judicial-review provision from the Social Security Act:

> The findings and decision of the [Secretary] after a hearing shall be
> binding upon all individuals who were parties to such hearing.  No
> findings of fact or decision of the [Secretary] shall be reviewed by
> any person, tribunal, or governmental agency except as herein
> provided.  No action against the United States, the [Secretary], or
> any officer or employee thereof shall be brought under section 1331
> or 1346 of Title 28 to recover on any claim arising under this
> subchapter.

42 U.S.C. § 405(h); see id. § 1395ii (incorporating § 405(h)).  As long interpreted by the

Supreme Court, this prohibition "reaches beyond ordinary administrative law principles of

'ripeness' and 'exhaustion of administrative remedies.'"  Shalala v. Ill. Council on Long Term

Care, Inc., 529 U.S. 1, 12 (2000).  It instead demands that, where "both the standing and the

substantive basis for the presentation" of a plaintiff's claims is the Medicare Act, those

complaints "must be 'channeled' through the administrative process" before reaching the courts.

Id. at 12 (quoting Heckler v. Ringer, 466 U.S. 602, 614 (1984); Weinberger v. Salfi, 422 U.S.

749, 760-61 (1975)).  That is, the bar applies to "virtually all legal attacks," whether procedural

or substantive, constitutional or non-constitutional, future or present, legal or fact-specific.  Id. at

13-14; see Ringer, 466 U.S. at 615; Salfi, 422 U.S. at 760.

Both parties acknowledge that Arriva has not completed the statutorily prescribed

administrative process.  See 42 C.F.R. §§ 498.40-.79 (ALJ review); id. §§ 498.80-.95 (DAB

review).  The company has, in fact, only arrived at the ALJ's doorstep.  Plaintiff nonetheless

leans on two exceptions to the aforementioned general rule: One operates when sending claims

through the administrative gantlet would lead to no judicial review at all, see Council for

Urological Interests v. Sebelius, 668 F.3d 704, 707-08 (D.C. Cir. 2011) (citing Bowen v. Mich.

Acad. of Family Physicians, 476 U.S. 667 (1986)), and another exempts certain legal attacks that are entirely collateral.  As it is the second of these routes that paves a narrow path to federal court, the Court only discusses that one in full.

The "wholly collateral exception," established by Mathews v. Eldridge, 424 U.S. 319 (1976), protects a plaintiff's "claim to a predeprivation hearing as a matter of constitutional right [that] rests on the proposition that full relief cannot be obtained at a postdeprivation hearing."  Id. at 331 (emphasis added).  That individual is permitted judicial review when he (1) "assert[s] a procedural challenge to the Secretary's denial of a pretermination hearing . . . that [i]s wholly 'collateral' to his claim for benefits" and (2) "ma[kes] a colorable showing that his injury could not be remedied by the retroactive payment of benefits after exhaustion of his administrative remedies."  Ringer, 466 U.S. at 618; see Eldridge, 424 U.S. at 330-32.  The exception is a restrictive one, limited to the "unique nature" of certain pre-deprivation-hearing claims.  Jarkesy v. SEC, 803 F.3d 9, 27 (D.C. Cir. 2015).

The first prong is, at least in part, satisfied.  On this front, even the Government "concede[s] that [the constitutional claim] could be wholly collateral."  PI Hearing Tr. at 31:5-6.  For a cause of action to be entirely collateral, it must not be "the vehicle by which [the plaintiff] seek[s] to reverse" the agency decision, Elgin v. Dep't of Treasury, 132 S. Ct. 2126, 2139 (2012), or seeks an ultimate award of the benefits denied it by the agency.  Bowen v. City of New York, 476 U.S. 467, 483 (1986); see Ringer, 466 U.S. at 614 (rejecting claims that were "at bottom" for benefits).  Even where a plaintiff does not directly challenge the substance of agency action, his claims may still be barred if they are "inextricably intertwined with the conduct of the very [administrative] proceeding the statute grants the [agency] the power to institute and resolve as an initial matter."  Jarkesy, 803 F.3d at 23.

The Court first observes that, under this standard, it lacks jurisdiction over Arriva's APA count. That claim to "hold unlawful and set aside agency action, findings, and conclusions" is not collateral. See Compl., ¶ 97 (quoting 5 U.S.C. § 706(2)(A)). Such a count is on its face a "vehicle" to reverse — hence, "set aside" — CMS's revocation. Elgin, 132 S. Ct. at 2139. In other words, a plaintiff that "seeks to rescind the termination of its provider status" through the APA would necessarily ask the Court "to immerse itself in those regulations and make a factual determination as to whether [Plaintiff] was actually in compliance." Affiliated Prof'l Home Health Care Agency v. Shalala, 164 F.3d 282, 285-86 (5th Cir. 1999). Permitting jurisdiction in such a case "would allow any party to avoid the Medicare Act's administrative procedures for reviewing the Secretary's determinations" in an effort to prevail on "its substantive claim to benefits or participation." Cathedral Rock of N. Coll. Hill, Inc. v. Shalala, 223 F.3d 354, 363 (6th Cir. 2000). These questions are beyond this Court's purview at this stage. (Indeed, because Arriva can bring such an APA count after exhaustion, see 42 U.S.C. § 1395cc(j)(9), the briefly mentioned Michigan Academy exception would not grant jurisdiction either.)

A limited constitutional count is thus all that the Court can adjudicate. Since Eldridge, due-process "claim[s] to a predeprivation hearing as a matter of constitutional right" have fit under this narrow exemption, see 424 U.S. at 331, as they are not fundamentally aimed at upending any particular administrative outcomes. See Ringer, 466 U.S. at 618; e.g., Ram v. Heckler, 792 F.2d 444, 446 (4th Cir. 1986) (Medicare context); Himmler v. Califano, 611 F.2d 137, 148 (6th Cir. 1979) (same); Town Court Nursing Ctr., Inc. v. Beal, 586 F.2d 266, 275 (3d Cir. 1978) (en banc) (same). On this score, the thrust of Arriva's due-process challenge is that further pre-deprivation safeguards must obtain before CMS revokes a supplier's billing privileges.

It is not enough, though, that Arriva merely wants more pre-deprivation process, as it must satisfy the test's second prong for that claim as well.  Where (as here) post-administrative-review payments are available if a supplier succeeds, see 42 C.F.R. § 424.545(a)(2), Eldridge jurisdiction is limited to those instances where "an erroneous termination would damage [the plaintiff] in a way not recompensable through retroactive payments."  424 U.S. at 331. Plaintiff's burden is to make a "colorable showing" that the delay in payment would cause independent harm.  Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 213 (1994); see Jarkesy, 803 F.3d at 27.  That is to say that Arriva's showing of irreparable harm must not be "wholly insubstantial and frivolous."  Ibrahim v. District of Columbia, 463 F.3d 3, 8 (D.C. Cir. 2006) (quoting Bell v. Hood, 327 U.S. 678, 682-83 (1946)).

Although a full assessment of the harms will come into sharper focus when the Court discusses whether to grant a preliminary injunction, it notes that Plaintiff's entreaty is at least colorable.  Such pleas do not rise to that level only when the plaintiff "does not cite to any harm that it would suffer."  Cathedral Rock, 223 F.3d at 364 (emphasis added).  Arriva meets this low bar.  It first asserts that the company's customers continue to flee as a result of the revocation, meaning that for those customers Arriva would have no claims for which to even seek retroactive reimbursement.  See Ram, 792 F.2d at 446; Araujo Decl., Exh. 12 (Customer Letters).  For those who remain, the company must also continue to distribute diabetic-testing equipment gratis in order to obtain later payments, a practice that could push it out of business.  See Humane Soc'y v. Cavel Int'l, Inc., No. 07-5120, 2007 WL 4723381 (D.C. Cir. May 1, 2007) (per curiam) (where petitioner might "go out of business"); see also Araujo Decl., ¶¶ 20-32.  Finally, Arriva contends that, given its expansive role in supplying rural communities where access to healthcare is limited, its business risks may ultimately fall on the shoulders of Medicare beneficiaries.  See

Int'l Long Term Care, Inc. v. Shalala, 947 F. Supp. 15, 18 (D.D.C. 1996) (recognizing "interests of health care providers and Medicare beneficiaries are closely intertwined"); see also 2016 Zip Code Mix.  While, as spelled out below, these harms fail to meet the higher threshold of likely being irreparable, they do satisfy the "lenient" jurisdictional one.  See United States v. Andrews, 146 F.3d 933, 937 (D.C. Cir. 1998).

As a final note, in at least two Medicare-provider cases involving nursing facilities, circuit courts have found that a pre-deprivation due-process challenge is not even a colorable legal claim.  See Cathedral Rock, 223 F.3d at 364-66; Americana Healthcare Corp. v. Schweiker, 688 F.2d 1072, 1082-83 (7th Cir. 1982).  Those cases precluded subject-matter jurisdiction on that ground that circuit precedents had already rejected that class of suits.  See Americana, 688 F.2d at 1082-83 (concluding claims "specifically rejected" in Northlake Cmty. Hosp. v. United States, 654 F.2d 1234, 1241 (7th Cir. 1981)); see also Cathedral Rock, 223 F.3d at 364-66 (adopting Northlake); Oakland Med. Grp., P.C. v. Sec'y of HHS, 298 F.3d 507, 510-511 (6th Cir. 2002) (adopting Cathedral Rock for clinical-testing sites).  This Court will not go that far — as there are at least some arguable differences between the providers there (e.g., noncompliant nursing homes) and suppliers — though the weakness in Plaintiff's position does later present a barrier to the odds of success on its due-process claim.  See Americana, 688 F.2d at 1074-79 (discussing resurvey process for nursing facilities); Oakland Med., 298 F.3d at 511 (noting health-and-safety concerns).

B.  Preliminary Injunction

As previously foreshadowed, jurisdiction is only the first hurdle.  Plaintiff must still show that its cause of action — a due-process claim to greater pre-deprivation process — warrants the extraordinary relief of an injunction requiring Defendant to suspend its billing-privileges

revocation.  The Court first addresses irreparable harm before moving on to likelihood of
success.

          1.  *Irreparable Harm*

      The Court begins where it left off — with whether equitable relief would prevent
irreparable harm.  The Circuit has set a "high standard": The injury, first, must be "certain and
great" and "actual and not theoretical" and, second, must be "<u>irreparable</u>."  <u>Chaplaincy</u>, 454 F.3d
at 297 (quoting <u>Wisc. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*)).
"Mere injuries, however substantial, in terms of money, time and energy necessarily expended in
the absence of a stay are not enough" when "adequate compensatory or other corrective relief
will be available at a later date." <u>Wisc. Gas</u>, 758 F.2d at 674 (quoting <u>Va. Petrol. Jobbers Ass'n</u>
<u>v. Fed. Power Comm'n</u>, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Where the harm is financial,
moreover, "an insufficiency of savings or difficulties in immediately obtaining [replacement
income] . . . will not support a finding of irreparable injury, however severely [it] may affect a
particular individual." <u>Sampson v. Murray</u>, 415 U.S. 61, 92 n.68 (1974).

      As noted, Plaintiff promotes a few theories of certain, irreparable injury: that supplying
diabetic-testing equipment in the interim will eventually bankrupt it, that its loss of customers is
irremediable, and that Medicare beneficiaries will themselves suffer absent an injunction.
Defendant, in principal part, rejoins that each of these risks is built into the Medicare scheme.
<u>See</u> Def. Reply at 24-26.  The Court agrees with the Government that Arriva has not carried its
burden.

          a.  Destruction of Business

      Chief among Arriva's complaints is that it "may be forced to shutter its doors before the
administrative process concludes."  Pl. Mot. at 39-40.  Although monetary loss is generally

reparable if the company may recover later reimbursement, a limited exception exists where it can show that it would be insolvent by the time payment arrived.  See Wisc. Gas, 758 F.2d at 674 ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business."); see also CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995) (discussing possibility of bankruptcy).  The Court, on the other hand, cannot rescue a plaintiff from mere loss of income.  See Sampson, 415 U.S. at 92 n.68.

Arriva's plight here falls short.  It points out that, to obtain potential later reimbursement, it must continue to supply diabetic-testing meters and strips for free.  See Araujo Decl., ¶ 21. This assuredly comes at a loss.  Where it appears the company would normally profit some $4 million per quarter (its quarterly operating income), it now projects eating a business loss of almost $20 million per quarter on account of the billing revocation.  See Araujo Decl., Exh. 14 (2017 Forecasted Income Statement) (assuming "no Diabetic/Ancillary business").  These are no mere shillings.

Yet the sole fact that a company is losing money does not irreparable harm make.  A profit/loss statement does not, on its own, show whether the entity is above water or instead flirting with bankruptcy.  That is, even if Arriva is currently bleeding funds, it has neglected to provide basic accounting information in the form of a balance sheet showing its total assets and liabilities — which might reveal abundant cash reserves or other fungible assets.  See Freidus v. United States, 223 F.2d 598, 604 & n.14 (D.C. Cir. 1955) (spelling out that while income statements show profitability, balance sheets show assets and liabilities).  And although Plaintiff briefly makes the argument that its mounting losses are an "existential threat to its business as a going-concern," Def. Reply at 21 (emphasis added), courts have not generally embraced the

theory that "cash flow problems . . . constitute sufficient irreparable injury." Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 206 (3d Cir. 1990).

Arriva's own affidavits likewise gloss over these shortcomings.  Its General Manager first attests only that "Arriva anticipates that it will eventually go out of business."  Araujo Decl., ¶ 25 (emphases added).  This already meek declaration retreats further in a second affidavit: "If Arriva's market share is significantly reduced, it risks being unable to operate and being forced out of business."  Pl. Mot., Exh. B (Supplemental Declaration of Claudio Araujo), ¶ 18 (emphases added).  Finally, the affidavits do not contend that Arriva would essentially need to drop its diabetic-testing business and pursue some other line of work to survive.  See Holiday Tours, 559 F.2d at 843 (recognizing a company's "destruction in its current form as a provider of bus tours").  The sparse, equivocal statements appearing in the record thus cannot support a court's finding that an existential threat to Arriva would be certain, actual, and imminent.  See Wisc. Gas, 758 F.2d at 674 ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur.").

The principle that companies must save funds in advance is especially relevant in the Medicare context.  Congress, in designing the program, explicitly factored in the possibility that the administrative-appeals process preceding retroactive payments would result in "individual, delay-related hardship."  Ill. Council, 529 U.S. at 13.  The legislature thus accepted the lesser evil of corporate financial adversity if it meant that scores of revoked companies would not run to the courts and sue Medicare for immediate relief.  See Ringer, 466 U.S. at 627 ("Congress must have felt that cases of individual hardship resulting from delays in the administrative process had to be balanced against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year.").

Plaintiff, a sophisticated business, surely was aware of this need to prepare for losses

accumulated during the administrative process.  Medicare's implementing regulations spell it out

in the plainest of terms: "Payment is not made during the appeals process."  42 C.F.R.

§ 424.545(a)(2).  Knowing of this, Arriva would be wise to have hoarded its own rainy-day fund.

Sampson, 415 U.S. at 92 n.68 (disregarding "insufficiency of savings").

> b.  Loss of Customers

Arriva's second related harm fares no better.  The company complains that significant

numbers of its customers have been switching suppliers ever since CMS informed them of the

revocation.  Assuming (to Plaintiff's benefit) that all lost business is attributable to the

revocation, the customer-attrition rate doubled in November 2016, from (generally) over 8,000

customers leaving each month to 16,000 or more exiting — a monthly loss of roughly 3.5% of its

customer base.  See Araujo Decl., Exhs. 15-18 (Customer Attrition and Orders Rates).  New

customers are also projected to be a third (or less) of what they were, dropping from 3,000 or

4,000 in the preceding two months to roughly 2,200 in November and an estimated 1,300 in

December — although the Court notes here that this loss is in keeping with a trend beginning in

June 2016.  Id.  From a financial standpoint, it would be impossible for Arriva ultimately to seek

retroactive payments for customers it no longer has or for those who would have joined Arriva's

rolls, but decided not to.  Plaintiff, in essence, could not be made whole by such payments.

Significant holes in Plaintiff's hull cause this position to founder.  To begin, Arriva's

losses are not as devastating as the company suggests.  See Chaplaincy, 415 U.S. at 91 (requiring

harm to be "great").  From these submissions, it appears that customers have trickled out and not

necessarily fled, and this is even assuming that lost orders are not due to natural fluctuations,

whether seasonal or on account of the company's rapidly aging population.  See Customer

Attrition and Orders Rates.  Plaintiff's contention that it is certain to lose its following, moreover, stands in significant tension with another of its assertions.  Arriva separately claims that, "because the majority of its patients live in rural areas with little to no access to other providers, no other supplier has the capacity to fill the gap that Arriva's exit will create."  Pl. Mot. at 4.  Yet if Arriva indeed has sole market control over certain parts of the country, then it logically follows that no other supplier is perched in the wings, ready to steal its customers.

Plaintiff attempts to tack the ship by pointing out that, in the eyes of its customers, Arriva's reputation has diminished.  See Jones v. District of Columbia, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) ("[H]arm to reputation can, in certain circumstances, constitute irreparable injury.").  This the company has not shown.  Rather, its customers' affidavits leave room for substantial doubt.  See Pl. Mot., Exhs. E-I (Declarations of Cathy Hacker, Jose Martinez, Mary Richie, Peter Salcedo, and Shirley Richards).  Each says: "I was distressed upon receiving [CMS's] letter, because Arriva is my trusted medical supplier and I did not want to locate another supplier that may not provide me with the same level of trust and comfort that I have come to have with Arriva."  E.g., Hacker Decl., ¶ 9.  Quite the opposite of losing goodwill from CMS's notification to affected beneficiaries, it appears that many customers are still eager to remain with the company.  See id., ¶ 12 ("[I]t is of critical importance to me that I am able to continue to receive [m]y diabetic testing supplies from Arriva Medical.").  As to the various letters from customers who have left, even those missives — rather matter-of-fact statements that they are moving on — do not in any way vilify the company or tarnish its reputation.  See Customer Letters; see also Jones, 177 F. Supp. 3d at 547-48 (reasoning public reporting of change of status was not, on its own, enough to constitute reputational damage).

Arriva's purported injury faces a final gusty headwind.  The company must still answer the causal question of whether "equitable relief [would] <u>prevent</u> irreparable harm."  <u>Chaplaincy</u>, 454 F.3d at 297 (emphasis added).  Although the requested injunction would temporarily restore Arriva's billing privileges, that relief does not directly change the company's status *vis-à-vis* its customers.  Put another way, from a rational consumer's standpoint, the result of Arriva's being reimbursed or not would remain the same — *i.e.*, free supplies.  To the extent that Arriva suggests that CMS's letter nudged beneficiaries to jump ship <u>too soon</u>, moreover, this Court seems unlikely to be able to persuade them to come back.  <u>See</u> Nov. 7, 2016, Letter from CMS. How to explain the revocation to Medicare beneficiaries and its consequences is not a business issue that the Court can readily address.

### c.   Injury to Beneficiaries

Unable to marshal any of its own harms, Arriva enlists the interests of beneficiaries with diabetes.  This *levée en masse* promises no greater success.  To start, in the usual case, a pure injury to third parties should be reserved for the public-interest prong of the preliminary-injunction standard.  <u>See Jones</u>, 177 F. Supp. 3d at 546 n.3; <u>Cardinal Health, Inc. v. Holder</u>, 846 F. Supp. 2d 203, 213 (D.D.C. 2012); <u>Humane Soc'y v. Johanns</u>, No. 06-265, 2007 WL 1120404, at *11 n.6 (D.D.C. Apr. 13, 2007).

In the Medicare context, moreover, the Court questions whether an irreparable injury to third-party patients, standing alone, would be sufficient when a company's <u>own</u> harm does not reach that threshold.  This is because third-party customers have no "substantive right" to the provider of their choice.  <u>O'Bannon v. Town Court Nursing Ctr.</u>, 447 U.S. 773, 786 (1980).  If anything, the Medicare scheme contemplates that patients "may be injured . . . due to revocation" of a single provider and "may have difficulty locating other [providers] they consider suitable or

may suffer both emotional and physical harm as a result of disruption." Id. at 787.  Revocation itself implies some level of disruption.

Even reframing Plaintiff's harm as an injury to its "ability to render effective medical services to those in need," Arriva's claim would fall short.  Beverly Enters. v. Mathews, 432 F. Supp. 1073, 1079 (D.D.C. 1976); see Int'l Long Term Care, 947 F. Supp. at 18 (considering harms to beneficiaries and providers to be "closely intertwined").  The Government here has minimized any upheaval to Arriva and its patients alike by temporarily keeping in place the company's mail-order contract, meaning that the supplier–beneficiary relationship is at least able to continue uninterrupted (albeit at a cost).  See Def. Mot. at 12; Araujo Decl., ¶ 21.  Any injury to Arriva's ability to distribute diabetes supplies therefore assumes that Plaintiff is unable to continue its business.  Fatally for Arriva, that assumes too much.  See supra III.B.1.a & b.

* * *

In sum, none of Arriva's theories of irreparable harm is persuasively demonstrated on the present record.  Given that it is Plaintiff's burden to show that such injury is likely absent an injunction, its Motion fails for at least this reason.  See CityFed, 58 F.3d at 747.  The Court nonetheless discusses Arriva's likelihood of success on the merits of its due-process claim as an alternative ground for denying relief, as there, too, the company's case is thin.

## 2.  *Likelihood of Success*

If irreparable harm is the moat, then success on the merits is the castle wall — both halt Plaintiff's advance.  To prevail, Arriva bears the burden of showing a substantial likelihood that the Due Process Clause entitles it to additional pre-deprivation process.  See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428 (2006) ("[T]he party seeking pretrial relief bears the burden of demonstrating a likelihood of success on the merits.").  In

considering Arriva's chances here, the Court first articulates the relevant principles of due

process before sketching out the particulars of the Medicare-appeals procedure and evaluating

Plaintiff's claim that more pre-deprivation process is due.

a.   Procedural Due Process

"An essential principle of due process is that a deprivation of life, liberty, or property 'be

preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Cleveland

Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (quoting Mullane v. Cent. Hanover Bank

& Tr. Co., 339 U.S. 306, 313 (1950)).  Its purpose "is not only to ensure abstract fair play to the

individual," but "to minimize substantively unfair or mistaken deprivations."  Freeman v. FDIC,

56 F.3d 1394, 1403 (D.C. Cir. 1995) (quoting Fuentes v. Shevin, 407 U.S. 67, 80-81 (1972)).

A "familiar two-part inquiry" applies to such procedural-due-process claims.  UDC

Chairs Chapter v. Bd. of Trs. of the Univ. of D.C., 56 F.3d 1469 1471 (D.C. Cir. 1995) (quoting

Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982)); see Connecticut v. Doehr, 501 U.S.

1, 12 (1991).  Courts "must [first] determine whether [Plaintiff] was deprived of a protected

interest, and, if so, whether [it] received the process to which [it] was entitled."  Thompson v.

District of Columbia, 832 F.3d 339, 344 (D.C. Cir. 2016).  In this instance, Defendant concedes

the first prong — i.e., that Arriva has a "liberty or property" interest in its billing privileges, the

deprivation of which would trigger due-process protections.  See Pl. Hearing Tr. at 7:24-8:2.

The inquiry here thus centers on what process is due before CMS's revocation takes

effect.  To answer this question, courts bear in mind that "[t]he essence of due process is the

requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him

and opportunity to meet it' . . . 'at a meaningful time and in a meaningful manner.'"  Propert v.

District of Columbia, 948 F.2d 1327, 1331-32 (D.C. Cir. 1991) (quoting Eldridge, 424 U.S. at

348; <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 (1965)).  A "root requirement" of due process is

that an individual have an opportunity to be heard "before he is deprived of any significant

[liberty or] property interest, except for extraordinary situations where some valid governmental

interest is at stake that justifies postponing the hearing until after the event."  <u>Boddie v.

Connecticut</u>, 401 U.S. 371, 379 (1971) (footnote omitted).

     Such a pre-deprivation "'hearing,' though necessary, need not be elaborate."  <u>Loudermill</u>,

470 U.S. at 545.  "The formality and procedural requisites for the hearing can vary, depending

upon the importance of the interests involved and the nature of [any] subsequent proceedings."

<u>Id.</u> (quoting <u>Boddie</u>, 401 U.S. at 378).  Some baselines are still worth setting.  Prior to an adverse

agency action, it is generally the case that "'something less' than a full evidentiary hearing is

sufficient."  <u>Id.</u>  As Justice Byron White put it, only "some kind of hearing" is necessary.  <u>Wolff

v. McDonnell</u>, 418 U.S. 539, 557 (1974); <u>see</u> Henry J. Friendly, "Some Kind of Hearing," 123

U. Pa. L. Rev. 1267 (1975).  In the administrative-law context, the Supreme Court has only once

"required a full adversarial evidentiary hearing prior to adverse governmental action."

<u>Loudermill</u>, 470 U.S. at 545 (citing <u>Goldberg v. Kelly</u>, 397 U.S. 254 (1970)).

     Due process, finally, "is not a technical conception with a fixed content unrelated to time,

place and circumstances," but rather "is flexible and calls for such procedural protections as the

particular situation demands."  <u>Eldridge</u>, 424 U.S. at 334 (quoting <u>Cafeteria Workers v.

McElroy</u>, 367 U.S. 886, 895 (1961); <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972)).  In fact,

the Supreme Court articulated the relevant factors in its seminal case of <u>Eldridge</u>, which this

Court sets forth shortly.

b.   Medicare Administrative-Appeals Process

Before it does so, the Court must "turn first to a description of the procedures" for the

revocation of billing privileges.  Id. at 335.  Such description explores how the principles of due

process actually play out through Medicare's elaborate administrative-appeals scheme (which

includes numerous procedural safeguards).

"Each time" CMS finds that a provider has billed for deceased beneficiaries, the agency

sends it a remittance-advice statement noting that "[t]he date of death precedes the date of

service" and informing it that Medicare does not reimburse those services.  See Def. Reply at 20

n.11 (citing 42 C.F.R. § 405.921(b)).  This is apparently completed "in the ordinary course of

Medicare claim processing," id., and can be accomplished by running a quick cross-check with

certain databases.  See Revocation Letter at 1; Compl., ¶ 54.

It follows that companies, like Arriva, must be aware that faulty billing is monitored.  Not

only do they sometimes receive these remittance notices, but (as demonstrated in this case) they

at times affirmatively refund CMS after billing for deceased beneficiaries.  See PI Hearing Tr. at

14:14-17, 33:15-22; Compl., ¶ 52.  Medicare's Program Integrity Manual, moreover, warns that

the National Supplier Clearinghouse maintains fraud-level indicators for all suppliers in Arriva's

position.  See MPIM, § 15.21.4.  That Manual then makes clear what those under CMS's

watchful gaze must do to avoid billing errors: "[S]uppliers must contact the beneficiary prior to

dispensing the refill . . . to ensure that the refilled item is necessary and to confirm any

changes/modifications to the order . . . no sooner than 14 calendar days prior to the

delivery/shipping date."  Id., § 4.26.1.

All of these events precede a decision to revoke for abuse of billing privileges.  To take

that action, CMS's PEOG first informs the supplier of the "basis or reasons for the

determination" and "effect of the determination," 42 C.F.R. § 498.20(a), giving it 30 days' notice

of the revocation.  See id. § 424.535(g).  The supplier may then seek reconsideration before a

PEOG hearing officer, id. § 498.22(a), and is entitled to a decision within 90 days of that request.

See MPIM, § 15.25.2.2(D).  The reconsideration request allows a supplier to "state the issues, or

the findings of fact with which [it] disagrees, and the reasons for disagreement."  42 C.F.R.

§ 498.22(c).  Also available is the opportunity to submit "additional information" — indeed, the

"party must submit that information" as this would be its "only opportunity to submit

information during the administrative appeals process," unless the ALJ later gives specific leave

to do so.  See MPIM, § 15.25.2.2(D) (emphases added).  The reconsideration thus in large part

sets the record.

The PEOG hearing officer then reviews the initial revocation determination and any

evidence submitted by the supplier.  See 42 C.F.R. § 498.24; MPIM, § 15.25.2.2(D).  The final

reconsideration letter restates PEOG's initial findings; summarizes the provider's evidence;

provides a "clear explanation of why PEOG is upholding or overturning the . . . revocation action

in sufficient detail for the provider to understand PEOG's decision and, if applicable, the nature

of the provider's deficiencies"; and supplies "the regulatory basis to support each reason for the .

. . revocation."  MPIM, § 15.25.2.2(E).  Given the 30-day revocation window, sometimes the

effective date falls before reconsideration, and sometimes, as here, it falls after.

There is also post-deprivation — or, in this case, post-reconsideration — process.

"[E]xistence of post-termination procedures is relevant to the necessary scope of pretermination

procedures."  Loudermill, 470 U.S. at 547 n.12; see Cassim v. Bowen, 824 F.2d 791, 798 (9th

Cir. 1987) ("The general rule is that the less the predeprivation process, the greater must be the

post-deprivation process.").  In this context, an aggrieved supplier may request a hearing before

an ALJ from HHS and obtain "a written decision" "[a]s soon as practical after the close of the

hearing." 42 C.F.R. § 498.74; see id. §§ 498.40(a), 498.44(c). The Government informs the

Court that the ALJ would generally abide by a 180-day timeline, starting with the date of the

supplier's request. See Def. Mot. at 7 (citing 42 C.F.R. § 498.79); PI Hearing Tr. at 36:5-17

(stating "they're required to be done in six months" and that Arriva's 180-day clock would end

by June 26, 2017). Adding the decisional deadlines together, a supplier denied billing privileges

that diligently pursues its administrative appeals will generally not linger without an ALJ

decision for more than roughly 9 months.

Those ALJ proceedings are more expansive than reconsiderations. They involve

adversarial proceedings where CMS is also a party, 42 C.F.R. § 498.42; the opportunity to argue

additional issues, id., § 498.56(a); an oral hearing before the ALJ (unless an affected party

waives it), id. §§ 498.60, 498.66; the ability to subpoena and call witnesses, id., §§ 498.58,

498.62; the chance to supplement the record if "good cause" exists, id., §§ 498.56(e), 498.61;

and "a reasonable time to present oral summation and to file briefs or other written statements of

proposed findings of fact and conclusions of law." Id., § 498.63.

Following an ALJ decision, either party may then request that a panel of the DAB — at

least two members of the Board and a representative from the U.S. Public Health Service —

review it. Id., §§ 498.80, 498.83(d). At that level, a supplier again has the opportunity to

"specify the issues, the findings of fact or conclusions of law with which the party disagrees, and

the basis for contending that the findings and conclusions are incorrect." Id., § 498.82(b). DAB

proceedings likewise involve another "reasonable opportunity to file briefs," present oral

argument, and submit additional relevant evidence. Id., §§ 498.85, 498.86. Following this,

aggrieved parties have full recourse to federal court. 42 U.S.C. § 1395cc(j)(9). If at any time the

revocation is reversed, the supplier will receive retroactive payment for claims it submitted in the interim.  See 42 C.F.R. § 424.545(a)(2).

> c.  Whether Additional Process is Due

In arguing that more pre-deprivation process is due, Arriva faces an uphill climb.  It must show that further pre-deprivation safeguards would somehow add value to the already "elaborate character of the administrative procedures provided by the Secretary."  Eldridge, 424 U.S. at 339-40.  That arduous hike grows steeper given the dozen or so appellate decisions that have denied the need for courts to supplement the Medicare scheme with additional pre-deprivation procedures.  See, e.g., Patchogue Nursing Ctr. v. Bowen, 797 F.2d 1137 (2d Cir. 1986); Case v. Weinberger, 523 F.2d 602 (2d Cir. 1975); Ritter v. Cohen, 797 F.2d 119 (3d Cir. 1986); Town Court Nursing Ctr., Inc. v. Beal, 586 F.2d 266 (3d Cir. 1978) (en banc); Varandani v. Bowen, 824 F.2d 307 (4th Cir. 1987); Oakland Med. Grp., P.C. v. Sec'y of HHS, 298 F.3d 507 (6th Cir. 2002); Cathedral Rock of N. Coll. Hill, Inc. v. Shalala, 223 F.3d 354 (6th Cir. 2000); Americana Healthcare Corp. v. Schweiker, 688 F.2d 1072 (7th Cir. 1982); Northlake Cmty. Hosp. v. United States, 654 F.2d 1234 (7th Cir. 1981); Cassim v. Bowen, 824 F.2d 791 (9th Cir. 1987); Koerpel v. Heckler, 797 F.2d 858 (10th Cir. 1986); Geriatrics, Inc. v. Harris, 640 F.2d 262 (10th Cir. 1981).

Yet another boulder impedes Arriva's path.  Plaintiff's briefing lacks some clarity, as it first requests that, before "the government seeks to revoke a provider's billing rights, the provider is entitled to a hearing and an opportunity to overturn that decision."  Compl., ¶ 86 (emphases added).  On another occasion, however, it cites in an explanatory parenthetical Goldberg's prescription of a "full evidentiary pre-deprivation hearing."  Pl. Mot. at 26.  Following the Court's preliminary-injunction argument, Arriva refined its position further and

now asks the Court to halt the revocation of its billing privileges "until <u>all</u> administrative and judicial review and appeals have been exhausted." Pl. Suppl. Mem. at 6 (quoting <u>New Orleans Home for Incurables, Inc. v. Greenstein</u>, 911 F. Supp. 2d 386, 413 (E.D. La. 2012)).

The Court reads Plaintiff's pleadings generously. It first tackles Arriva's intimation that no hearing has occurred here before analyzing whether the <u>Eldridge</u> test demands that more pre-deprivation process is due.

### i.   Hearing Already Received

While Arriva asserts throughout its opening brief that it has not yet obtained a hearing, that is not so. <u>See</u> Def. Mot. at 1 ("Without any hearing or advance notice, [HHS] revoked the Medicare billing rights of plaintiff . . . ."). A "hearing" is simply an "<u>opportunity</u> to present reasons, either in person or <u>in writing</u>, why proposed action should not be taken." <u>Loudermill</u>, 470 U.S. at 546 (emphases added). The Court first focuses on whether Plaintiff has received that chance to be heard. <u>See</u> <u>Thompson</u>, 832 F.3d at 345.

Arriva obtained such an opportunity to present reasons on the papers when it received a reconsideration decision from PEOG prior to the revocation. This paper hearing gave the company a chance to present evidence (in the form of dozens of exhibits) and arguments to a hearing officer not involved in the original decision. <u>See</u> Revocation Letter at 2. Given the restrictions on adding evidence to the record later, Arriva in fact had a substantial incentive to provide <u>all</u> the documentation that could support its case. Following its submissions, Plaintiff received a three-page exposition cataloguing all of its arguments and explaining why PEOG was upholding the revocation. <u>See</u> Reconsideration Letter at 2-4; <u>see also</u> MPIM, § 15.25.2.2(E).

A paper hearing is still a hearing. Although the reconsideration process lacked an <u>oral</u> component, courts have never held that a hearing "requires oral presentation of views as a matter

of course." Pickus v. U.S. Bd. of Parole, 543 F.2d 240, 246 (D.C. Cir. 1976).  For instance, in

CNG Transmission Corp. v. FERC, 40 F.3d 1289 (D.C. Cir. 1994), the D.C. Circuit addressed a

situation where the Federal Energy Regulatory Commission denied a company's petition to

claim certain monetary losses as regulatory assets.  In response, FERC notified the company of

its initial determination and permitted an opportunity to "provide[] supplemental information."

Id. at 1294.  Given these facts, CNG found that this paper process counted as "notice and an

opportunity to be heard before the determination was made" — i.e., a hearing.  Id. at 1295.

        The Court also observes that something more than a paper hearing happened here.  A few

weeks later, Arriva had an in-person meeting with higher-ups in CMS, including the head of

PEOG and that person's boss, who led CMS's Center for Program Integrity.  See Araujo Decl.,

¶ 18.  At the conference, Arriva was able to present its side of the story and ask CMS to air its

trepidations.  Id.  Arriva was even able to speak later with the Acting Administrator of CMS

regarding the agency's concerns with the company.  Id.  The presence of both a paper hearing

and oral presentation thoroughly debunks Plaintiff's first allegation that it has not yet received

"an opportunity to present [its] side of the story."  Loudermill, 470 U.S. at 546.  It has instead

received that and more.

### ii.  Eldridge Balancing Test

        Against this backdrop, the Court finally analyzes whether more process is due.  Arriva

asserts that it is entitled to, at a minimum, a "full evidentiary pre-deprivation hearing" — with

presentation of witnesses and further submission of evidence — and perhaps even something

beyond that.  See Pl. Mot. at 26; Pl. Suppl. Mem. at 6 (seeking administrative and judicial

review).  In other words, the company contends that the Government violated its constitutional

rights because the "specific dictates of due process" require something more than Medicare's

typical pre- and post-revocation procedures and something more than the reconsideration and

oral discussions actually obtained here.  See Eldridge, 424 U.S. at 335.

These questions of pre-revocation process implicate Eldridge's "three distinct factors":

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail.

Id. (emphases added); Wash. Teachers' Union v. Bd. of Educ., 109 F.3d 774, 780 (D.C. Cir.

1997).  After weighing these factors and Plaintiff's counterarguments, this Court concludes that

Arriva is unlikely to succeed on its claim that the Government deprived it of requisite pre-

deprivation process.

First, the Court has discussed the private interests affected by these sorts of revocations at

some length in its section on irreparable harm.  See supra Section III.B.1.  A few points bear

reiterating, however.  To begin, "the private interest at stake is not particularly strong because the

Medicare provider is not the intended beneficiary of the Medicare program."  Cathedral Rock,

223 F.3d at 364-65 (citing Northlake, 654 F.2d at 1242; Town Court, 586 F.2d at 277).  Beyond

that, suppliers also receive full retroactive payments if they prevail.  See 42 C.F.R.

§ 424.545(a)(2).  The only interest for a provider then is in "uninterrupted" reimbursements.

Eldridge, 424 U.S. at 340.  Here, the interruption spans only three months before an on-the-

papers reconsideration decision and usually another six months before a full ALJ decision.  See

MPIM, § 15.25.2.2(D); Def. Mot. at 7 (citing 42 C.F.R. § 498.79); PI Hearing Tr. at 36:5-17.

The fact that the "length of wrongful deprivation" is, in many cases, relatively predictable is "an

important factor in assessing the impact of official action on the private interests."  Fusari v.

Steinberg, 419 U.S. 379, 389 (1975).  Companies can, and should, plan financially for a months-long duration of financial loss.  See Ill. Council, 529 U.S. at 13.

Second, the Court is not persuaded that additional safeguards would offer much to mitigate the risk of error.  Generally, that risk must start low, as figuring out whether this type of billing-error regulation was violated appears to turn on "routine, standard, and unbiased" reports.  Eldridge, 424 U.S. at 344 (quoting Richardson v. Perales, 402 U.S. 389, 404 (1971)); see Revocation Letter at 1 (describing check with Social Security Administration's master list); Compl., ¶ 54 (describing Medicare-eligibility check with its database).  The chance that the Government has mistakenly identified a candidate for revocation is also small, given the iterative interactions between CMS and suppliers over their billing.  The agency tells companies when they mess up, see 42 C.F.R. § 405.921(b), and likewise makes clear what they must do to avoid billing mistakes.  See MPIM, § 4.26.1; see also Town Court, 586 F.2d at 278 (considering "well-defined criteria" that "are well known in advance to the provider").  Given the "numerous opportunities" that providers are thus given to internalize their missteps, the Court must believe that the risk of error is slim when CMS finally chooses to revoke billing privileges.  See Patchogue, 797 F.2d at 1145.

As mentioned, Plaintiff is also unclear as to what this "something more" in terms of process would entail.  Even if the Court assumes it essentially desires all the trappings of a full evidentiary hearing à la Goldberg, Arriva has not carried its burden of linking any safeguard with the risk of error that it would mitigate.  Suppliers could obtain the right to call witnesses; yet the Court does not see how a witness would help the parties suss out whether, for example, beneficiaries were in fact deceased.  Companies might wish to subpoena CMS for further documentary evidence; again, the Court fails to comprehend the marginal value of that added

process, as the Government reveals to suppliers the sample claims data that form the basis for its decision.  It is not evident, moreover, given that the reconsideration record largely carries over to later hearings, that there is a likelihood that an earlier pre-deprivation error would be corrected through additional process.  See MPIM, § 15.25.2.2(D).

Plaintiff's most specific contention is that the Court should "require the government to provide a reasoned explanation for imposing such a draconian result."  Def. Reply. at 13.  First, to the extent that Arriva is inserting a direct challenge to CMS's "improper enforcement," the Court would lack jurisdiction over such an "unquestionably administrative" complaint.  Affiliated Prof'l Home, 164 F.3d at 285-86.  Second, if Arriva instead means to argue that the Medicare setup is particularly susceptible to arbitrary-and-capricious enforcement, the company cites only its own circumstances and offers no reason to believe that this is generally so.  See Def. Reply. at 13-14.

Finally, construing Plaintiff as narrowly asking that CMS more fully explain to suppliers why it revoked them instead of imposing some lesser consequence first also does not get Plaintiff far.  See Def. Reply. at 12-14; see also Loudermill, 470 U.S. at 544 (considering whether "a fully informed decisionmaker might not have exercised its discretion").  There appears to be no significant likelihood that CMS would undo its actions given that it has already been clear in its instructions to suppliers, see MPIM, § 4.26.1, investigated and set forth the "basis and reasons" for its decisions, see 42 C.F.R. § 498.20(a), and rested its initial decision on "objective fact[s]" as opposed to any "subjective" considerations.  Loudermill, 470 U.S. at 544 n.9.  All of this aside, the need for a more in-depth enforcement explanation in an unlikely source for a due-process violation when Plaintiff has already pled its case before the acting head of CMS, among others.  See Araujo Decl., ¶ 18.

Third, the Government has significant programmatic interests.  Defendant asserts that it "has an interest in having the secretary be able to administer the program in a timely and efficient manner, and enforce regulations quickly and effectively and prevent fraud."  TRO Hearing Tr. at 30:11-14.  These concerns are interrelated.

At the forefront is "the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases."  Eldridge, 424 U.S. at 347.  If Plaintiff were to obtain a hearing, it follows that other similarly situated suppliers would likely be able to assert those same procedural-due-process rights; the Court could not pluck Arriva out of the crowd for special treatment.  This would have consequences for the system writ large.  Although the Court cannot "predict" with certainty the cost of requiring front-end hearings as opposed to post-revocation ALJ hearings for all suppliers, it can assume that the "additional cost in terms of money and administrative burden would not be insubstantial."  Id.; see Ritter, 797 F.2d at 123 ("Requiring full-blown evidentiary hearings would impose significant monetary costs."); Town Court, 586 F.2d at 278 (referencing "large number of providers participating in Medicare").

Related is the concern that public resources spent on prosecuting billing abuse should instead be expended on CMS's core mission — healthcare.  Dollars spent by various agencies and components litigating revocations are ones that cannot be used to fund other Medicare and Medicaid programs.  See Eldridge, 424 U.S. at 348 ("Significantly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited.").  Considering these implications of diverting federal healthcare dollars, Courts have thus found that "the government has a strong

interest in minimizing the expenses of administering the Medicare program." Northlake, 654 F.2d at 1242.

On the Government's interest, Arriva retorts that all the prior Medicare cases denying pre-deprivation hearings, see supra Section III.B.2.c, have rested on a concern that the provider or physician's practices are endangering health and safety. See Pl. Reply at 17-18. That appears to be so, at least for Medicare providers. But see Eldridge, 424 U.S. at 349 (denying hearings even to individual social-security recipients). The fact that this case does not demonstrably threaten the health of specific patients might inch Plaintiff closer to a likelihood of success. Cf. Zevallos v. Obama, 793 F.3d 106, 116 (D.C. Cir. 2015) (recognizing post-deprivation process may be sufficient "where a State must act quickly") (quoting Gilbert v. Homar, 520 U.S. 924, 930 (1997)). But as another court put it, "Because the [Supreme] Court has been so reluctant to extend the requirement of a full pre-termination evidentiary hearing which approximates a judicial trial, [the procedural-due-process] legal arguments do not present difficult or doubtful questions" to begin with. Koerpel, 797 F.2d at 869. Arriva is only closer to a bar it cannot reach.

The weakness of its overall position is borne out in its citation to a plethora of district-court cases. A number of them either do not even analyze procedural due process or rest their relief on some non-constitutional violation (which this Court lacks jurisdiction to hear). See Blossom South, LLC v. Sebelius, No. 13-6452, 2013 WL 4679275 (W.D.N.Y. Aug. 30, 2013) (no mention of due process); Pathfinder Healthcare, Inc. v. Thompson, 177 F. Supp. 2d 895 (E.D. Ark. 2001) (similar); Oak Park Health Care Ctr., LLC v. Johnson, No. 09-217, 2009 WL 331563 (W.D. La. Feb. 10, 2009) (no due-process analysis); Ridgeview Manor of Midlands, L.P. v. Leavitt, No. 07-861, 2007 WL 1068224 (D.S.C. Mar. 30, 2007) (similar); Peak Med. Okla.

No. 5, Inc. v. Sebelius, No. 10-597, 2010 WL 4809319, at *2 (N.D. Okla. Nov. 18, 2010) (APA claim); Mediplex of Mass., Inc. v. Shalala, 39 F. Supp. 2d 88, 98 (D. Mass. 1999) (weighing "statutory arguments"); Int'l Long Term Care, 947 F. Supp. at 15 (assessing if plaintiff "might well prevail on the merits after. . . exhaust[ion]"); Claridge House, Inc. v. HHS, 795 F. Supp. 1393 (S.D. Ohio 1991) (questioning HHS's statutory authority); see also Cathedral Rock, 223 F.3d at 363 (denying jurisdiction over "a legal question involving general statutory analysis").

Others have involved some sort of concession from the Government that benefits or privileges should continue.  See New Orleans Home for Incurables, Inc. v. Greenstein, 911 F. Supp. 2d 386, 407 (E.D. La. 2012) (agreeing to suspend decision underlying termination); Libbie Rehab. Ctr., Inc. v. Shalala, 26 F. Supp. 2d 128 (D.D.C. 1998) (conceding Government was in process of reconsidering decision).  And a final class of cases pertains to a complete lack of notice or the absence of any available process.  See John E. Andrus Mem'l, Inc. v. Daines, 600 F. Supp. 2d 563, 580 (S.D.N.Y. 2009); Beverly, 432 F. Supp. at 1078.  Suffice it to say that those cases do not bear on this one, as notice was present and Medicare's post-deprivation protections are elaborate.

To conclude, Arriva seeks to supplement a Medicare scheme that is already extensive. That setup protects serious societal interests in healthcare, guards against billing abuse through routine revocation decisions that are not highly susceptible to error, and warns suppliers how they must prepare for such revocation.  Balancing these Eldridge considerations — and the timely post-deprivation safeguards — the Court concludes that suppliers are unlikely to be entitled to the full evidentiary hearing that Arriva seeks prior to a revocation.

Even assuming that due process demands that Medicare's appeals scheme guarantee a few additional (unspecified) pre-revocation safeguards short of a full evidentiary hearing,

Plaintiff does not show that such a requirement was <u>violated</u>.  In other words, to be "aggrieved by a violation of procedural due process," Arriva would still need to prove that it did not actually receive the added process that was due.  <u>See</u> <u>Perry v. Blum</u>, 629 F.3d 1, 17 (1st Cir. 2010); <u>see also</u> <u>Thompson</u>, 832 F.3d at 344 (asking "whether [Plaintiff] received the process he was due"); <u>Nat'l Treasury Emp.'s Union v. Reagan</u>, 663 F.2d 239, 249 (D.C. Cir. 1981) (examining what process individual "actually received").  Yet here, Arriva obtained all the "essential requirements of due process" through paper hearing and later oral presentation, which also encapsulated most of the safeguards that a court could conceivably require.  <u>See</u> <u>CNG</u>, 40 F.3d at 1295 (quoting <u>Loudermill</u>, 470 U.S. at 546); <u>see</u> <u>Robinson v. Huerta</u>, 123 F. Supp. 3d 30, 48 n.12 (D.D.C. 2015) (concluding plaintiff failed to state violation stemming from lack of oral hearing when he had obtained paper hearing); <u>see also</u> *supra* Section III.B.2.c.i.  Seeing as the company has not demonstrated that procedural due process likely requires <u>more</u> than what it has actually obtained — *e.g.*, witnesses or additional paper evidence — the Court cannot conclude that there likely exists here a due-process violation that warrants injunctive relief.

* * *

In short, the concerns that propelled the <u>Eldridge</u> Court to refuse added pre-deprivation process apply here.  The private interests are meek, the value of added process is nebulous, and the Government interests reflect areas of traditional public concern.  Given also the process that has occurred and will occur, moreover, the Court sees no reason why it should pen its own procedural additions in the margins of Medicare's labyrinthine regulations.

As Arriva has thus shown neither a likelihood of irreparable harm nor the prospect of success on the merits, the Court ends its analysis here and does not discuss the remaining

preliminary-injunction factors.  See Winter, 555 U.S. at 23-24; Ark. Dairy Co-op, 573 F.3d at 832.

IV.     **Conclusion**

For these reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss for lack of jurisdiction and also deny Plaintiff's Motion for a Preliminary Injunction.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  March 9, 2017